SUN DUN, INC. OF
WASHINGTON, Plaintiff,

v.

The COCA–COLA COMPANY, General Cinema Beverages of Washington, D.C., Inc., d/b/a Pepsi–Cola Bottlers of Washington, D.C., Mid–Atlantic Coca–Cola Bottling Company, Inc. and Pepsi-Co, Inc., Defendants.

Civ. A. No. S 88–2540.

United States District Court,
D. Maryland.

June 25, 1990.

Wilbur D. Preston, Jr., Fenton L. Martin, Nevett Steele, Jr., and Whiteford, Taylor & Preston, Baltimore, Md., for plaintiff.

Francis B. Burch, Jr. and Jeffrey D. Herschman, Piper & Marbury, Baltimore, Md., and William M. Dreyer, Atlanta, Ga., for defendant Coca–Cola Co.

Thomas M. Wilson, III, Tydings & Rosenberg, Baltimore, Md., and C. Benja- min Crisman, Jr., William J. Guzick, and Henry L. Huser, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for defendant General Cinema Beverages.

Gerald A. Connell, Lee H. Simowitz, Peter B. Kenney, Jr., and Jenifer M. Brown, Baker & Hostetler, Washington, D.C., and Lee T. Ellis, Jr., Baker & Hostetler, Beltsville, Md., for defendant Mid–Atlantic Coca–Cola Bottling Co.

Theodore Sherbow and Henry R. Abrams, Weinberg & Green, Baltimore, Md., and Fred A. Freund, Richard M. Steuer, and John K. Crossman, Kaye, Scholer, Fierman, Hays & Handler, New York City, and Gerard W. Casey, Sommers, N.Y., for defendant PepsiCo, Inc.

## MEMORANDUM

SMALKIN, District Judge.

This antitrust case is before the Court on motions of all defendants to dismiss the Amended Complaint pursuant to Federal Civil Procedure Rule 12(b)(6). There has been thorough briefing by all parties, and the motion will be decided without oral argument, as permitted by Local Rule 105(6), D.Md.

## FACTUAL BACKGROUND

Plaintiff, Sun Dun, Inc., is in the business of marketing and servicing vending machines as a "full service vendor."[1] Defendants Coca–Cola and PepsiCo manufacture trademarked, secret formula soft drink syrup and sell it to licensed, franchised distributors, who in turn mix, package, and distribute the final products. Defendant Mid–Atlantic Coke is a licensed distributor for Coca–Cola in the Washington, D.C. metropolitan area, which includes portions of Maryland and Virginia. Defendant General Cinema, Inc., is a distributor for PepsiCo in the same region. Both General Cinema and Mid–Atlantic are also en-

---

1. A "full service vendor" is one who, in addition to supplying and maintaining the machines themselves, stocks them with beverages and collects the monies. Amended Complaint, ¶ 7. Sun Dun's machines are capable of dispensing different drinks at different prices, and it therefore stocks its machines with a variety of products, including cans of soft drinks and fruit juices.

gaged in the full service vending machine business.

Sun Dun seeks in this action to redress alleged harm arising from its inability to obtain Coca–Cola and Pepsi–Cola products "at competitive prices" in the Washington, D.C. metropolitan area from Mid–Atlantic and General Cinema ("the bottler defendants") or from any other source. Plaintiff claims that the imposition of, and adherence to, territorial and marketing restrictions by various combinations of the defendants have prevented it from competing effectively in the market, by essentially cutting off supply of two of its major product lines. Sun Dun argues that the conduct of the defendants in creating these unfavorable conditions violates Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3 (1982), as well as the District of Columbia's antitrust laws, D.C.Code Ann. §§ 28–4502 and –4503 (1981). Plaintiff seeks the monetary and injunctive relief available under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1982), and D.C.Code Ann. §§ 28–4508, –4509 (1981). Sun Dun has also set forth claims in tort for unfair competition and tortious interference with business relationships.

## DISCUSSION

### Standard of Review of Motions to Dismiss

In deciding a motion to dismiss, all inferences must be drawn in favor of the plaintiff, and "the facts must be viewed as the plaintiff most strongly can plead them." *Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F.2d 456, 457 (4th Cir. 1983), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986). The district court may not, then, grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The Supreme Court has applied this standard rigorously in antitrust cases, holding that in such cases "dismissals prior to giving the plaintiff ample opportunity for discovery should be grant-

ed very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

### The Federal Claims
#### Standing

As a threshold issue, defendants challenge Sun Dun's standing to assert Sherman Act claims, arguing that Sun Dun has made only indirect, not direct, purchases from the defendants. Under the holding of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), federal antitrust law provides no remedy for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), for those who have made merely indirect purchases from defendants. The Supreme Court recently reaffirmed this interpretation of Section 4 in *Kansas v. Utilicorp United, Inc.,* —— U.S. ——, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). *See also California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). Sun Dun, however, has asserted that, in addition to its indirect purchases, it made some direct purchases from one or more of the defendants. Amended Complaint, at ¶¶ 22, 24, 31, 55. Although the Amended Complaint provides few details about the direct purchases, the allegations are sufficient to confer standing upon Sun Dun to assert claims for damages arising from those purchases.

Sun Dun also seeks injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 (1982). Here, Sun Dun's status as an indirect purchaser is not a bar to standing. Following the lead of the Third and Fifth Circuits, other judges of this Court have held that a plaintiff who cannot seek damages for indirect purchases under Section 4 of the Clayton Act may nevertheless seek injunctive relief under Section 16. *National Constructors Association v. National Electrical Contractors Association,* 498 F.Supp. 510, 524 (D.Md.1980) (Murray, J.), *aff'd as modified,* 678 F.2d 492 (4th Cir.1982), *cert. dismissed,* 463 U.S. 1234, 104 S.Ct. 26, 77 L.Ed.2d 1449 (1983); *Dart Drug Corp. v. Corning Glass Works,*

480 F.Supp. 1091, 1105 (D.Md.1979) (Watkins, J.). *See also In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1167 (5th Cir.1979), *cert. denied sub nom. Safeway Stores, Inc. v. Meat Price Investigators Association*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980); *Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 590–94 (3d Cir.1979). *Cf. Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 524 n. 5, 103 S.Ct. 897, 901 n. 5, 74 L.Ed.2d 723 (1983) (declining to address issue of standing under Section 16); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (determining that equitable relief under Section 16 requires proof of only "a significant threat of injury" from antitrust violations, not an "actual injury"). Of course, "plaintiff here must still establish, as Section 16 requires, that principles of equity entitle it to such injunctive relief." *Dart Drug*, 480 F.Supp. at 1105. *See also National Constructors*, 498 F.Supp. at 524. For the purposes of ruling on defendants' motions to dismiss, however, it is not necessary to consider the merits of plaintiff's claims. *Dart Drug*, 480 F.Supp. at 1105. It is sufficient to note that at this stage of the proceedings, Sun Dun has standing to seek injunctive relief under federal antitrust laws as both a direct and indirect purchaser.

### Restraint of Trade

In Counts I, II, and III of its Amended Complaint, Sun Dun alleges unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act. Because the substantive elements of a claim under Section 3 are identical to those under Section 1, *see Association for Intercollegiate Athletics for Women v. National Collegiate Athletic Association*, 735 F.2d 577, 580 n. 1 (D.C.Cir.1984), the Court will deal with these claims simultaneously.[2]

■ To state a claim under Section 1, a plaintiff normally must allege facts supporting (1) an agreement, conspiracy, or combination among the defendants in restraint of trade; (2) injury to the plaintiff's business and property as a direct result; and (3) damages capable of reasonable ascertainment. *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1139 n. 1 (4th Cir.1980).

■ Count I is based on an alleged horizontal price-fixing conspiracy between General Cinema and Mid–Atlantic. In support of this Count, plaintiff has alleged facts relating to Sun Dun's own experiences in attempting to buy at competitive prices from General Cinema and Mid–Atlantic which could support an inference that the two were engaged in price-fixing. In addition, the complaint alleges that both bottler defendants pleaded guilty to informations charging price-fixing during the time period at issue in this case. It is well settled that price-fixing constitutes restraint of trade in violation of Section 1. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Sun Dun has also sufficiently alleged a direct injury to its business which, if proved, could support an award of damages. Defendants' motions to dismiss with respect to Count I are therefore *denied.*

---

**2.** The only significant distinction between Sections 1 and 3 lies in the geographical area covered by each statute. Section 1 (as well as Section 2) regulates interstate commerce, and was enacted pursuant to Congress' power under the Commerce Clause of the Constitution. U.S. Const. art. 1, § 8, cl. 3. Section 3 regulates commerce in the District of Columbia (and in United States territories), and rests in part upon Congress' power to enact legislation for the District of Columbia. *Id.* at cl. 17. *See United States v. National Association of Real Estate Boards*, 339 U.S. 485, 488, 70 S.Ct. 711, 713, 94 L.Ed. 1007 (1950); *Darnell v. Markwood*, 220 F.2d 374, 376 (1954). Section 3 also regulates commerce between the District of Columbia and states or territories. Thus, plaintiff's federal claims alleging conspiracy or restraint of trade which involve interstate conduct properly fall within Section 1, while those federal claims involving conduct within the District of Columbia or between the District and neighboring states fall within Section 3. As discussed below in connection with the pendent claims, plaintiff's Amended Complaint does not specify where the transactions at issue took place. Nevertheless, it is not necessary to determine which section applies to a particular claim, because *either* Section 1 *or* Section 3 will govern.

Count II alleges combination and conspiracy among all four defendants [3] to prevent "transshipment" [4] of Coca–Cola and Pepsi–Cola products in violation of Sections 1 and 3. Count III asserts, on the same underlying facts, that the territorial restraints imposed by the manufacturer defendants and adhered to by the bottler defendants violated Sections 1, 2, and 3. Taking the facts alleged in the complaint as true, the basis for these claims is essentially as follows.

The price-fixing conduct of the bottler defendants resulted in a price, per case, for Coca–Cola and Pepsi–Cola products in the Washington, D.C., metropolitan area that exceeded the price in surrounding areas by approximately $1.00. The bottler defendants then prevented Sun Dun from competing effectively with their own vending machine businesses by demanding higher prices from it than those charged other customers, and by preventing it from purchasing from any other resellers. In response, plaintiff attempted to purchase the products from local retailers. These efforts were initially successful, but were soon frustrated when the bottler defendants threatened those retailers with dis-

continuation of their own supply. Attempts to purchase the products from resellers outside the region also failed after defendants placed Sun Dun trucks under surveillance, traced the cans sold in Sun Dun vending machines to the transshipping distributors, and imposed substantial fines on those distributors. While fixing wholesale prices of the two brands and preventing transshipment, the bottler defendants operated their own retail vending machines at prices which made it impossible for Sun Dun to compete.

### The Soft Drink Act

To the extent that the combinations and conspiracies alleged attack vertical arrangements,[5] the complaint in this case must overcome the hurdle presented by the Soft Drink Interbrand Competition Act, 15 U.S.C. §§ 3501 to 3503 (1982), in addition to meeting the ordinary pleading requirements for a Section 1 claim. The chief effect of the Act is to shield soft drink manufacturers and bottlers from antitrust liability to which they might otherwise be subject on the grounds of their enforcement of vertically organized territorial restraints.[6] Defendants are not entitled to

---

**3.** Although Sun Dun has asserted that "[a]ll four defendants combined and conspired," Amended Complaint, at ¶ 57, plaintiff is in fact alleging the existence of three separate conspiracies: a vertical conspiracy between PepsiCo and General Cinema, another vertical conspiracy between Coca–Cola and Mid–Atlantic, and a horizontal conspiracy between General Cinema and Mid–Atlantic. Any doubts with regard to the more ambiguous allegations throughout this count and the rest of the complaint are resolved by Sun Dun's own memorandum in opposition to the motions to dismiss. On pages 4–5 of its Opposition, plaintiff expressly states that it does not allege a conspiracy between Coca–Cola and PepsiCo.

**4.** Transshipment refers to the practice of resellers selling to other resellers outside of their territory. *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 174–75 (3d Cir.1988).

**5.** "Vertical arrangements" refer to agreements between the manufacturers and their respective bottler/distributors. It is through such agreements that Coca–Cola and PepsiCo are able to impose fines on distributors who overstep their territorial bounds by transshipping.

**6.** The Act does not purport to grant antitrust immunities. *See* H.R.Rep. No. 1118, 96th

Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin.News, 1980, p. 2373. Its protections represent a legislative response to questions over the proper application to the soft drink industry of the "rule of reason" approach to vertical restraints re-adopted by the Supreme Court in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Under this standard, vertical restraints such as those at issue in this case do not violate the antitrust laws if the overall effect of the restraint is to promote interbrand competition. After an in-depth investigation of the industry, Congress determined that "the public policy stated in the antitrust laws would be better served by the retention of the existing competitive structure [including vertical restraints] of the soft drink industry under the standards of this bill." S.Rep. No. 645, 96th Cong., 2d Sess. 9 (1980). *See Zimmerman,* 836 F.2d at 175–76.

Thus, while there is no price-fixing conduct alleged against either Coca–Cola or PepsiCo, the allegations pertaining to their enforcement of vertical restraints could conceivably subject them to § 1 liability, if (1) it is eventually established that the Act does not apply *and* (2) the conduct of the two manufacturers fails an independent rule-of-reason analysis under *Sylvania.*

the protection of the Act, however, unless their products are "in *substantial and effective* competition with other products of the same general class in the relevant market or markets." 15 U.S.C. § 3501 (1982) (emphasis added). Sun Dun alleges a lack of effective competition in the relevant market. Amended Complaint, ¶ 15. In addition, it alleges as the relevant market in this case "the manufacture, distribution, and sale of soft drinks which are to be resold to customers through soft drink vending machines in the Washington, D.C. metropolitan area, including Maryland and Virginia." Amended Complaint, ¶¶ 10, 65.

"Substantial and effective" interbrand competition is not defined in the text of the Act itself, but the committee reports suggest a number of factors to be weighed in determining whether such competition does in fact exist. The Senate report provides:

> The number of brands, types, and flavors of competing products available ...; persistence of long-run monopoly profits; the number of retail price options available to consumers; the persistence of inefficiency and waste; the degree of service competition among vendors; ease of entry into the market; the failure of output levels to respond to consumer demands; the number and strength of competing products in the territory; and a lack of opportunity to introduce more efficient methods and products.

S.Rep. No. 645, 96th Cong., 2d Sess. 10–11 (1980). The House report contains a similar litany, substituting "anti-competitive" for "monopoly" profits, and adding "availability of various forms of containers or packaging." H.R.Rep. No. 1118, 96th Cong., 2d Sess. 5–6 (1980), U.S.Code Cong. & Admin.News 1980, p. 2377. It is evident from the reports that Congress intended to protect the enforcement of vertical restraints only in those markets which actually yield the benefits of competition. It is not enough that the market contain nominal competitors; basic characteristics of a healthy market such as low consumer prices, wide availability of merchandise, and high quality must be present.

In weighing these factors to determine whether the Act applies in a given case, therefore, it is essential that the Court consider only facts tending to demonstrate the effect on *inter*brand competition. Facts tending to show, for example, that there exists little or no service competition among vendors of a particular brand are irrelevant for this purpose. Even a showing that such a condition exists within the chain of distribution of every brand in the market would have no bearing on the question of interbrand competition. Such facts go only to the question of *intra*brand competition.

Based on the facts alleged, it seems highly unlikely that there is an absence of "substantial and effective" interbrand competition in the relevant market. Even if a lack of competition could be shown to exist between Coca–Cola and Pepsi–Cola products, the Act would still apply in this case as long as those brands were in effective and substantial competition with the many other soft drink brands in the market. Still, for the purposes of this motion, plaintiff's allegation of a lack of effective interbrand competition must be taken as true. Of course, it might be established, through discovery, that there is no genuine dispute of material fact on this issue. But, because the Court must now assume that the Act does not apply, the allegations of restraint of trade in Count II are sufficient to withstand defendants' motions to dismiss, and the motions are therefore *denied.* For the same reasons, defendants' motions with respect to the functionally equivalent claims under Sections 1 and 3 contained in Count III will also be *denied.*

### The Vertical Monopoly Claim

■ Plaintiff also alleges in Count III that the vertical restraints discussed above violate Section 2 of the Sherman Act. That statute prohibits monopolization, attempt to monopolize, and conspiracy to monopolize interstate trade or commerce.[7] 15

---

7. As with Section 1 of the Sherman Act, Section 2 regulates interstate commerce and was enacted pursuant to Congress' power under the Commerce Clause. *See supra* note 2. On its face, Section 2 does not purport to regulate commerce in the District of Columbia, as does Sec-

U.S.C. § 2 (1982). Plaintiff has simply alleged a general violation of Section 2. Because only the vertical restraints are at issue in this Count, the allegations may be viewed as two independent identical charges against each manufacturer/bottler combination. At the heart of the claim is the proposition that each has monopolized, attempted to monopolize, or conspired to monopolize the market for its own brands by distributing those brands in a manner that exploited market power. While it is clear that this claim would be barred if the Soft Drink Interbrand Competition Act were found applicable in the instant case, the Court concludes that it must be *dismissed* for the independent reason that "monopolization" of one's own brand is not an antitrust violation. *See International Logistics Group, Ltd. v. Chrysler Corp.,* 884 F.2d 904, 908 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990).

In *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the Supreme Court made clear that the illegal market power which is the centerpiece of a monopoly must exist with respect to the competitive market for a commodity, as distinguished from legitimate market power over a single brand. *Id.* at 393, 76 S.Ct. at 1006. The Court emphasized in *dicta* that "the power that, let us say, automobile or soft drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly." *Id.* With respect to the Section 2 claims in Count III, therefore, the defendants' motions to dismiss are *granted.*

### Parallel Conscious Behavior

Count IV involves the same core facts as the prior counts, but asserts violations of Sections 1, 2, and 3 arising from the two vertical arrangements, as well as the horizontal price-fixing arrangement between the bottlers. As with the prior counts, the

bottlers are essentially charged with price fixing and prevention of transshipment, while the alleged liability of the manufacturers stems from conduct associated with the enforcement of vertical territorial restraints. Here, however, plaintiff does not plead a conspiracy between defendants but rather "parallel conscious behavior" which resulted in the creation of an oligopoly in the soft drink market. This count further alleges that the conduct creating the oligopoly rose to the level of concerted action, which damaged Sun Dun and competition in the market generally.

■ The Court agrees with plaintiff's contention that parallel concerted action may support a finding of a combination or conspiracy in violation of Section 1. *See United States v. General Motors Corp.,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966) (explicit agreement not required for Section 1 conspiracy when defendants acted neither separately nor independently). General Cinema cites *Universal Lite Distributors, Inc. v. Northwest Industries, Inc.,* 452 F.Supp. 1206, 1217 (D.Md.1978), *aff'd in part and rev'd in part,* 602 F.2d 1173 (4th Cir.1979), for the proposition that "conscious parallelism does not *establish* horizontal price fixing." *Id.* (emphasis added). That case does not compel dismissal here. In *Universal,* after extensive discovery, the plaintiffs had failed to produce any evidence of overt collusion, and summary judgment was granted. Here, plaintiff has alleged facts pertaining to overt collusion which, viewed in the light most favorable to it, are sufficient to overcome a motion to dismiss on these grounds.

Because the facts alleged in Counts I and II parallel those alleged in Count IV, with the exception of the element of express conspiracy, the Court finds the claims under Sections 1 and 3 sufficient to survive a 12(b)(6) motion. Also, because, for purposes of this motion, it must be assumed

---

tion 3. Nevertheless, because all four defendants are incorporated and do business outside of the District of Columbia, the Court will assume, for purposes of ruling on these motions, that at least some of the alleged monopolization activity by the defendants was interstate in na-

ture, and therefore would fall within Section 2. Because the Section 2 claims fail for the reasons set forth *infra,* the Court need not decide whether the statute would govern monopolization which occurred between states and the District of Columbia.

that the Soft Drink Interbrand Competition Act does not apply, it is unnecessary to rule on plaintiff's contention in this Count that 15 U.S.C. § 3502 (1982) deprives defendants of the Act's protection.

The Horizontal Monopoly Claims

Sun Dun's claim that the allegations in Count IV establish violations of Section 2 must be *dismissed.* First, no Section 2 claim can be stated with respect to the vertical arrangements as alleged in this case, for the reasons discussed in connection with Count III. Second, there is no allegation of any horizontal arrangement between the two manufacturers at all.[8] The only possible Section 2 claim remaining in Count IV, therefore, must be based on the horizontal arrangements between General Cinema and Mid–Atlantic.

■ In Count IV, Sun Dun alleges an oligopoly in violation of Section 2, and in Count VI it redepicts this state of affairs by alleging that "together they [General Cinema and Mid–Atlantic] monopolize the market." Amended Complaint, ¶ 80. Count V contains related allegations of a conspiracy to monopolize. The Amended Complaint does not specifically invoke the Section 2 prohibition against *attempted* monopolization. Each of these Counts alleges facts amounting to oligopoly and then simply applies a monopoly label to those facts in an effort to state a Section 2 claim. Oligopoly can, in some cases, violate Sections 1 and/or 3 of the Sherman Act, but *competitors*, by conspiring to maintain or create an oligopoly, do not run afoul of the Section 2 prohibitions against monopoly.

■ The Supreme Court set out the elements of a Section 2 claim of actual monopolization in *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). They are: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development

as a consequence of a superior product, business acumen, or historical accident." *Id.* Plaintiff has sufficiently alleged facts under the second element to support its claim that some market power was willfully, as opposed to accidentally, acquired, but its conclusory allegations to the effect that defendants as a group possessed monopoly power or dominant market power do not meet the requirements of the first element. Nowhere does plaintiff allege the requisite market power on the part of any *individual* defendant.

The court held in *Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.*, 535 F.Supp. 225 (S.D.N.Y. 1982), that an attempt to allege the necessary market power by aggregating the market power of several defendants is mere tautology. *Id.* at 228. Allegations that a group of defendants together possess dominant market power may state a Section 1 claim of oligopoly, but as the court held in *Consolidated*, "an oligopoly, or shared monopoly, does not in itself violate Section 2 of the Sherman Act. Rather, in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant." *Id.* at 228–29. In *American Telephone & Telegraph Co. v. Delta Communications Corp.*, 408 F.Supp. 1075, 1106 (S.D.Miss. 1976), *aff'd per curiam*, 579 F.2d 972 (5th Cir.1978), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979), the court explained the dangers of such a rule: "To hold that an oligopoly violates Section 2 amends the Act to subject to antitrust regulation businesses which lack the Section 2 required market control and the Section 1 conspiracy." *See also Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 554 F.Supp. 838, 841 n. 2 (S.D.N.Y.1982), *aff'd*, 724 F.2d 290 (2d Cir.1983), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984) ("To the extent that plaintiff is alleging that defendants as a

---

8. *See supra* note 3. The only allegations in Count IV pertaining to conscious parallel behavior are directed toward the bottler defendants. The manufacturers are alleged to have partici-

pated in the maintenance of an illegal oligopoly only through their enforcement of the *vertical* restraints.

group attempted to or have monopolized the cable industry, this is a claim of oligopoly, and is not cognizable under Section 2 of the Sherman Act."). This Court declines to interpret the Sherman Act in a way which would produce such a result. The actual monopolization claims are therefore *dismissed.*

 The claim that the bottlers engaged in a horizontal *conspiracy* to monopolize in violation of Section 2 is contained in Count V, and it can also be found in a broad reading of Count IV. The question whether two completely separate entities in competition with one another are capable of conspiring to monopolize has been the subject of theoretical debate. *See* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 841 (1978).[9] It does not appear, however, that any federal court has specifically ruled on this issue.

In *H.L. Hayden Co. v. Siemens Medical Systems, Inc.*, 672 F.Supp. 724 (S.D.N.Y. 1987), *aff'd*, 879 F.2d 1005 (2d Cir.1989), the court noted its "considerable discomfort" with the "seemingly antithetical" idea that two competitors could conspire to monopolize, but did not directly rule on the question. *Id.* at 741–42. In *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the Court affirmed a conviction of horizontal competitors for conspiracy to monopolize, but the issue whether *competitors* were capable of conspiring to monopolize was neither presented nor decided. The Court limited its review to the narrow question "whether actual exclusion of competitors is necessary to the crime of monopolization under Section 2 of the Sherman Act." *Id.* at 784, 66 S.Ct. at 1126.[10]

An examination of the history of the Sherman Act reveals that Congress' concept of "monopoly" did not include "shared monopolies" or "oligopolies" at all, but rather the complete domination of a market by a *single* economic entity.[11] For example, Senator Hoar, relating to the Senate the understanding of the committee, stated the definition of monopoly as "the sole engrossing to a man's self by means which prevent other men from engaging in fair competition with him." 21 Cong.Rec. 3152 (1890). Senator Edmunds, also reporting on the deliberations of the committee, stated that the subject "was not lightly considered by the committee," and endorsed a dictionary definition to the effect that monopoly exists when one "obtain[s] by any means the *exclusive* right [of trading]." *Id.* (emphasis added). *See also Mobil Oil Corp. v. Blanton*, 471 U.S. 1007, 1008, 105 S.Ct. 1874, 1874–75, 85 L.Ed.2d 166 (1985) (White, J., dissenting from denial of certiorari) ("Section 1 proscribes concerted action ... Section 2 regulates unilateral conduct.").

The idea that a monopoly is composed of a single economic entity is also reflected in the requirement in an actual monopolization claim that the requisite market power be held by a single defendant. This idea in no way precludes the possibility of a group of firms conspiring to monopolize, if the aim of the conspiracy is to form a single

---

9. Indeed, the whole issue of the applicability of Sherman Act § 2 to so-called "shared monopolies" is a matter debated among the treatise writers. *Compare* 3 P. Areeda & D. Turner, *supra*, ¶¶ 842–862 (arguing for regulation of oligopoly under § 2) *with* 2 E. Kintner, *Federal Antitrust Law* § 12.1 (1980) (actual monopolization can be accomplished only by a single firm).

10. Conversely, in its recent decision in *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 996 (4th Cir.1990), the Fourth Circuit affirmed the granting of defendants' motion for summary judgment on a Section 2 claim, based on an alleged conspiracy between competitors to monopolize. The appellate court's decision, however, rested on the absence of evidence of a conspiracy; the opinion did not address the issue of whether competitors could ever conspire to monopolize in violation of Section 2.

11. Horizontal conspiracies among competitors have not been contemplated as candidates for monopoly regulation in subsequent legislation either. The SDICA, for example, exempts from protection the private enforcement of vertical restrictions by means of price-fixing agreements, horizontal restraints of trade, or group boycotts. 15 U.S.C. § 3502 (1982). Each of these means of enforcement violates § 1 of the Sherman Act. Were conspiracy to monopolize among competitors possible, we would be left with the anomalous result that horizontal conspiracy to monopolize might be a *protected* means of enforcement of vertical restraints.

entity to possess the illegal market power. When, however, two or more competitors conspire to create a market environment in which competition and market entry is improperly restricted, but in which market power continues to be shared among these otherwise unrelated entities, this Court holds that there is no conspiracy to monopolize claim stated under Section 2, and the claim must therefore be *dismissed.*

In Count V, Sun Dun alleges that all four defendants conspired to monopolize the relevant market for soft drinks as defined in the preceding counts. While it clearly asserts that each defendant "conspired," the Amended Complaint is totally ambiguous regarding the question of which defendants conspired with which other(s). As discussed above, Sun Dun's memorandum in opposition to the motions to dismiss makes clear that it does not allege any conspiracy between the two manufacturers.[12] If no high-level horizontal conspiracy is alleged, it is not possible that all four defendants were joined in one comprehensive conspiracy. Thus, in order to give effect to the allegation that Coca–Cola and PepsiCo were conspirators, at least two vertical conspiracies must be inferred. The possibility of an additional claim of a low-level horizontal conspiracy between the two bottlers fails for the reasons discussed above.

If Count V is viewed as alleging twin vertical conspiracies to monopolize involving each manufacturer and its bottler, it must also be *dismissed.* The relevant market over which a monopoly exists cannot be defined as narrowly as a single brand. Indeed, plaintiff does not purport to define the relevant market as containing only the products of a single manufacturer, but rather as the more general market for soft drinks dispensed through vending machines. It is impossible for either manufac-

turer to conspire with its bottler to monopolize this market unless the conspiracy has as its *purpose* the elimination not only of other full-service vendors such as Sun Dun, but also of other soft drink brands, from this market. There are no facts alleged remotely suggesting such an objective. Further, it appears fatally inconsistent to assert that General Cinema and Mid–Atlantic each independently engaged in conspiracies to vertically monopolize (to the exclusion of one another) and at the same time conspired *with* one another to monopolize horizontally.

### Essential Facilities

In Count VI, Sun Dun alleges a conspiracy to monopolize between General Cinema and Mid–Atlantic, claiming that defendants violated Sections 2 and 3 by denying it access to "essential facilities" of its business, namely cans of Coca Cola and Pepsi–Cola products.

The so-called "essential facilities" doctrine does not create a new species of antitrust violation. It simply addresses the narrow situation in which a firm gains monopoly power by controlling and refusing to deal in an essential facility at one stage of production, thus extending its monopoly to other stages of production, and to other markets. *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1132 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The elements of liability under the doctrine are: (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *Id.* at 1132–33.[13] Failure to plead facts supporting any one of these elements is sufficient to support dismissal. Due to the

---

**12.** *See supra* notes 3 and 8.

**13.** As is suggested by these elements, the essential facilities doctrine relates most directly to a claim of monopolization under Section 2 of the Sherman Act. *See Hendricks Music Co. v. Steinway, Inc.,* 689 F.Supp. 1501, 1509 (N.D.Ill.1988). Nevertheless, some courts have applied the doctrine to claims under Sections 1 and 3 as well. *See, e.g., Hecht v. Pro–Football, Inc.,* 570 F.2d

982, 992–93 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Beverage Management, Inc. v. Coca–Cola Bottling Corp.,* 653 F.Supp. 1144, 1156 (S.D.Ohio 1986). Because, as discussed *infra,* Sun Dun has otherwise failed to state a claim under the essential facilities doctrine, the Court need not decide the scope of the doctrine's application.

somewhat novel nature of the essential facilities claim here, however, the Court will discuss the deficiencies in the allegations in turn.

■ In support of the first element, Sun Dun alleges that "[t]ogether, they [General Cinema and Mid–Atlantic] monopolize the market." Amended Complaint, ¶ 80. Because, as discussed above, competitors in the same market are not capable of monopolizing that market, Sun Dun is no more able to state a Section 2 claim under the essential facilities doctrine than it was in the prior counts. Sun Dun argues, however, that cases like *Beverage Management,* 653 F.Supp. at 1156, establish the proposition that control by a group of businesses does not defeat liability under the doctrine. While it is certainly true that an essential facility need not be controlled by a single firm,[14] it does not follow that competitors, each exercising control over *separate products*, meet the requirements of the first element. *See Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1034 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). Although the essential facilities doctrine applies to facilities which enable the monopolist to *extend* monopoly power from one stage of production to another, it does not apply to *end products* in markets containing several competing brands. A single brand cannot function as a bottleneck over such a market. By withholding access to a brand, therefore, a firm is not able to extend monopoly power through subsequent stages of production.

Sun Dun alleges that it is "unable to duplicate the essential facility [cans of Coca–Cola and Pepsi] since it is not a franchised, licensed bottler and must buy pre-mixed cans of Coca–Cola and Pepsi–Cola to stock its soft drink vending machines." Amended Complaint, ¶ 82. Sun Dun also alleges, however, that its machines sell both soft drinks and fruit juices, and that

Coca–Cola and Pepsi–Cola products combined account for only 50% of its business. Amended Complaint ¶ 16. It is the opinion of this Court that plaintiff also fails to allege sufficient facts to the effect that it is practically unable to duplicate the "facility."

■ The requirement that a plaintiff not be able to practically or reasonably duplicate the purported facility is not met simply by an allegation that the plaintiff is unable to participate in the manufacture and distribution of whatever brand of a product it chooses. Assuming, *arguendo*, that the brand name products can be "essential facilities," plaintiff cannot state a claim as long as it is able to find reasonable substitutes for these products. *See Monarch Entertainment Bureau, Inc. v. New Jersey Highway Authority*, 715 F.Supp. 1290, 1300 (D.N.J.), *aff'd without op.* 893 F.2d 1331 (2d Cir.1989) (arena not likely to be an essential facility unless there are no other facilities which could enable some form of competition); P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 736.2b (Supp. 1988) (essential facility must be vital, not merely helpful, to the plaintiff's competitive viability). Given the allegation that plaintiff is able to find other products with which to stock its machines, the fact that it is unable to "duplicate" cans of certain soft drinks is insufficient to meet the requirements of the second element. After all, people still do drink RC Cola.[15]

■ This Court is also of the opinion that particular brand names within a product market are not the appropriate subject matter of an essential facilities claim. Generally, the doctrine has been applied to situations in which *physical conditions* prohibit duplication of the facility. *Hendricks Music Co.*, 689 F.Supp. at 1509. *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 375, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973) (electric power lines); *Hecht*, 570 F.2d at 993 (football sta-

---

14. Even firms that are nominally competitors, if they act as a single economic entity with respect to the facility (*e.g.,* by sharing a single facility), may be subject to liability under the doctrine. *See Turf Paradise, Inc. v. Arizona Downs, 670*

F.2d 813, 822 (9th Cir.), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982).

15. "RC Cola" is a registered trademark of the Royal Crown Cola Company.

dium); *MCI Communications Corp.*, 708 F.2d at 1133 (telephone signal distribution facilities); *Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.*, 704 F.Supp. 1309, 1322 (D.Md.1989) (railroad tracks). No support emerges from the cases for the proposition that the legal impossibility of duplicating a trademarked product should be sufficient to satisfy this requirement of the doctrine. Indeed, it is not at all impossible for Sun Dun to manufacture and distribute its own soft drink products, as do many supermarket chains. It is merely impossible for Sun Dun to duplicate them in such a way as to capitalize on the brand recognition and goodwill of another firm's product. The antitrust laws protect competition; they do not compel a manufacturer to share the value of the goodwill acquired through competition. Defendants' motions to dismiss Count VI of the Amended Complaint are therefore *granted.*

### The Pendent Claims
#### The Exercise of Pendent Jurisdiction

■■■ The Court must next consider whether to exercise pendent jurisdiction over the claims set forth by Sun Dun which arise under the D.C.Code and tort law. *Cf.* 28 U.S.C. § 1366 (1982) ("laws applicable exclusively to the District of Columbia" are not federal laws, though enacted by Congress); *id.* § 1332(d) (District of Columbia is a "state" for purposes of diversity jurisdiction). The decision to exercise pendent jurisdiction lies solely within this Court's discretion. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *ARC America*, 109 S.Ct. at 1666. Here, Sun Dun's federal claims and its claims based on tort and the D.C.Code "derive from a common nucleus of operative fact." *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. Moreover, for the reasons set forth above, the federal claims have "substance sufficient to confer subject matter jurisdiction on the court." *Id.*

Finally, the Court believes that "considerations of judicial economy, convenience and fairness to [the] litigants," *id.* at 726, 86 S.Ct. at 1139, make it appropriate to exercise pendent jurisdiction over Sun Dun's common-law and statutory claims which do not rest on federal law. As discussed below, the D.C.Code provisions are *in pari materia* with the corresponding provisions of the Sherman Act; therefore, it is an economical use of judicial resources to resolve all claims in this proceeding. In addition, because the pendent claims might be time-barred were Sun Dun to seek to file suit in the District of Columbia or in a Maryland state court, it would be unfair for this Court to decline to exercise jurisdiction over these claims. *See Hector v. Weglein*, 558 F.Supp. 194, 207 (D.Md.1982); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3567.1, at 128–32 (1984).

#### Claims Based on the D.C.Code

In each of the counts of the Amended Complaint alleging a federal antitrust violation, Sun Dun has also invoked the parallel provisions of the D.C.Code. In considering these claims, it is necessary to address the background of the D.C.Code, the substantive interpretation of the pertinent statutes, and the applicability of the D.C.Code to the allegations set forth in the Amended Complaint.

■■■ The District of Columbia's antitrust laws are set forth at D.C.Code Ann. §§ 28–4501 to –4518 (1981). These statutes were adopted in 1980 by the Council of the District of Columbia, pursuant to the legislative authority granted to it by Congress in the District of Columbia Self Government and Governmental Reorganization Act of 1973 (the "Home Rule Act"), 87 Stat. 774, Pub.L. 93–198 (1973) (codified at Title 1 of the D.C.Code).[16] That power

---

**16.** As discussed above, *see supra* note 2, the Constitution grants Congress the power to legislate for the District of Columbia. U.S. Const. art. 1, § 8, cl. 17. Through the Home Rule Act, Congress has ceded some of that authority to the D.C. Council. *See* D.C.Code §§ 1–206, –233 (1981) (limits on Council's legislative authority).

The D.C.Code provisions at issue here were enacted by the Council, subject to the congressional oversight provided for in § 1–233(c), and "[s]ubject to the retention by Congress of the ultimate legislative authority over the nation's capital granted by article I, § 8, of the Constitution." *Id.* § 1–201(a). The Supreme Court long

extend[s] to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this Act subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States.

D.C.Code Ann. § 1–204 (1981). Thus, even though the District of Columbia is not a state, Congress has specifically determined that the legislative enactments of the D.C. Council are subject to the same constitutional constraints as are those of the states. Specifically, acts passed by the D.C. Council are subject to analysis under the federal preemption doctrine and the Commerce Clause. *See, e.g., Don't Tear It Down, Inc. v. Pennsylvania Avenue Development Corp.*, 642 F.2d 527, 534 n. 2 (D.C.Cir.1980) ("[S]urely the preemption doctrine effects [*sic*] District of Columbia legislation no less than state enactments."); *Quality Brands, Inc. v. Barry*, 715 F.Supp. 1138, 1139 (D.D.C.1989), *aff'd*, 901 F.2d 1130 (D.C.Cir.1990) ("[A] conventional Commerce Clause analysis does apply to laws passed by the D.C. government."). *Cf. John R. Thompson Co.*, 346 U.S. at 107, 73 S.Ct. at 1011 (suggesting, in a case preceding the Home Rule Act, that District of Columbia legislation would be subject to Commerce Clause analysis). This is true even though the Council's enactments are subject to congressional review. *See, e.g., Doe v. Stephens*, 851 F.2d 1457, 1465 (D.C. Cir.1988) (finding that District of Columbia Mental Health Information Act, which was enacted after congressional review, was preempted by preexisting federal statute); *Goudreau v. Standard Federal Saving & Loan Association*, 511 A.2d 386, 391–92 (D.C.1986) (holding that District of Columbia statute, enacted after congressional review, was preempted by federal banking law). *Cf. Gary v. United States*, 499 A.2d 815, 829 (D.C.1985), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986) (examining legislative history of Home Rule Act and concluding that Congress did

ago determined that "there is no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power."

not consider oversight provisions central to the Act).

The substantive provisions of the D.C. Code upon which Sun Dun relies mirror the corresponding provisions of the Sherman Act. In fact, Section 28–4515 declares: "It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes." D.C.Code Ann. § 28–4515 (1981). *Cf. Neugebauer v. A.S. Abell Co.*, 474 F.Supp. 1053, 1071 (D.Md.1979) (success or failure of state antitrust claims depended on that of federal claims, where state antitrust laws were patterned on federal statutes).

Specifically, Section 28–4502 of the D.C. Code is substantively the same as the first sentence of Section 3 of the Sherman Act, and is therefore akin to the first sentence of Section 1 of the federal law. Section 28–4503 prohibits the same conduct as does Section 2 of the Sherman Act. Thus, the discussion above concerning Sun Dun's claims under the Sherman Act pertains equally to Sun Dun's claims under the D.C. Code, and, thus, Sun Dun's claims brought under Section 28–4502 survive the pending motions, while its claims under Section 28–4503 must be *dismissed*.

The remaining sections of the D.C.Code which Sun Dun has invoked are remedial in nature. Section 28–4508 provides that "[a]ny person who is injured" may seek monetary and/or injunctive relief. As with Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), treble damages are available. D.C. Code Ann. § 28–4508 (1981).

 Section 28–4509 defines "injured" person to include "[a]ny indirect purchaser in the chain of manufacture, production, or distribution of goods or services." *Id.* § 28–4509(a). Sun Dun has alleged in its Amended Complaint that it made both direct and indirect purchases from the defendants. As noted in the discussion above concerning Sun Dun's standing to sue un-

*District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953).

der federal law, Section 4 of the Clayton Act does not permit claims for damages by indirect purchasers. *See Illinois Brick*, 431 U.S. 720, 97 S.Ct. 2061. Although the defendants argued in their motions to dismiss that the *Illinois Brick* doctrine mandated that the D.C.Code's cause of action for indirect purchasers be preempted by federal law, the Supreme Court has since answered this question squarely to the contrary in *ARC America*, 109 S.Ct. 1661. In that case, several states brought class actions against various cement manufacturers, alleging a nationwide conspiracy to fix prices. The plaintiffs invoked both federal and state antitrust statutes; the state laws provided a cause of action for indirect purchasers. The Court pointed out that "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies," and that consequently "federal antitrust laws do not preempt state law." *Id.* at 1665. The Court then determined that "nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *Id.* 109 S.Ct. at 1666. Consequently, Sun Dun's claims for damages as an indirect purchaser under the D.C.Code are not preempted by federal antitrust laws. Plaintiff's claims for injunctive relief survive as well, not only because the Supreme Court has held that state antitrust laws are not preempted, but also because, as noted above in the discussion of standing, federal law itself permits injunctive relief for indirect purchasers.

▮▮▮ The final issue is whether the D.C. Code can be applied to plaintiff's claims. The defendants maintain that Sun Dun has not alleged a sufficient nexus to the District of Columbia for its law to apply. In fact, the defendants assert that Sun Dun has invoked the D.C.Code only because, unlike federal and Maryland antitrust statutes, it provides a remedy in damages for indirect purchasers.

Sun Dun's Amended Complaint contains few specific references to the District of Columbia itself; most of the allegations refer to the "Washington, D.C. metropoli-

tan area," which by plaintiff's own definition includes Maryland and Virginia. Nevertheless, Sun Dun has asserted that it does much of its business in the District of Columbia, and thus it is possible that plaintiff has suffered harm there. Maryland applies the doctrine of *lex loci delecti. Hauch v. Connor*, 295 Md. 120, 123–25, 453 A.2d 1207, 1209 (1983); *White v. King*, 244 Md. 348, 352, 223 A.2d 763, 765 (1966). Consequently, this Court sitting in Maryland, could apply the law of the District of Columbia to the alleged harm suffered there by plaintiff. Although the allegations in the Amended Complaint are vague in terms of the *situs* of harm, the Court believes that they are sufficient to withstand defendants' motions to dismiss the claims based on the D.C.Code.

Nevertheless, even if, after discovery, it becomes apparent that the alleged harm suffered by Sun Dun bears a sufficient nexus to the District of Columbia to warrant application of that jurisdiction's law, a second and more significant bar may prohibit Sun Dun from recovery under the D.C.Code. As discussed above, the Commerce Clause of the United States Constitution applies to the laws of the District of Columbia. It is well established that "[t]he Commerce Clause ... permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." *Edgar v. MITE Corp.*, 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982) (emphasis in original). *See also City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The D.C.Code provisions at issue purport to regulate antitrust activity "throughout the District of Columbia," *see* D.C.Code Ann. § 28–4501 (1981), and are therefore constitutional on their face. Nevertheless, it clearly would be unconstitutional under the Commerce Clause to apply the D.C.Code to claims which, though bearing some connection to the District of Columbia, are in fact interstate in nature and are thus regulated by federal antitrust provisions. *See Flood v. Kuhn*, 407 U.S. 258, 284–85, 92 S.Ct. 2099, 2112–

13, 32 L.Ed.2d 728 (1972) (interstate transactions are governed by federal, not state, antitrust laws); *Denison Mattress Factory v. Spring–Air Co.*, 308 F.2d 403, 413 (5th Cir.1962) (because defendant's activities in Texas were "occasional and isolated and that the contract in question was interstate as to execution and performance," federal rather than state antitrust laws applied); *In re Wiring Device Antitrust Litigation*, 498 F.Supp. 79, 85 (E.D.N.Y.1980) (state antitrust laws could not apply because defendants' activities were interstate in nature).

Thus, the only claims of Sun Dun to which the D.C.Code might possibly apply are those for direct and indirect purchases within the District of Columbia which do not involve an interstate link, and which thus do not fall within the scope of federal antitrust law. Because all defendants, as well as plaintiff, are incorporated and have their principal places of business outside of the District of Columbia, it is uncertain whether Sun Dun in fact has any viable claims under the D.C.Code. *See id.* This determination, however, must await discovery and any motions for summary judgment which defendants choose to file.

### The Common–Law Tort Claims

Sun Dun has also set forth claims for unfair competition and for tortious interference with business relations. In their motions to dismiss, the defendants have assumed that Maryland law governs these claims, and Sun Dun has not disputed the applicability of Maryland law. Thus, although the *situs* of the alleged harm is not specified in the Amended Complaint, for the purpose of deciding the pending motions, the Court will consider these claims as arising under Maryland law.[17]

 Count VII of the Amended Complaint alleges that all four defendants unfairly competed with plaintiff by curtailing Sun Dun's supply of cans of Coke and Pepsi and by disparaging Sun Dun to its customers. Under Maryland law, a claim for unfair competition can encompass "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237, 34 A.2d 338 (1943). *See also Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md.App. 379, 389, 454 A.2d 367, 374 (1983) (quoting *Baltimore Bedding*). Sun Dun has alleged the "unfair methods" necessary to set forth a claim for unfair competition. Moreover, because a violation of antitrust laws could itself constitute unfair competition, *see id.*, this count must stand so long as Sun Dun has viable antitrust claims. Consequently, defendants' motions to dismiss Count VII are *denied.*

 Count VIII sets forth a claim for tortious interference with business relations against defendants PepsiCo and General Cinema, alleging that they disparaged Sun Dun to its customers and threatened suppliers who dealt with Sun Dun. Under Maryland law, this tort consists of four elements: " '(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.' " *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962, 964 (1909) (quoting *Walker v. Cronin*, 107 Mass. 562 (1881)), *quoted in Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 71, 485 A.2d 663, 675 (1984). Plaintiff's allegations

---

**17.** The Court finds it interesting that Sun Dun relies on Maryland common law, but District of Columbia statutory law, for relief from various harms arising from the same conduct by the defendants. As noted above, the defendants maintain that Sun Dun has invoked the D.C. Code only because it provides relief to an indirect purchaser, which is unavailable under federal and Maryland antitrust statutes. Although

Sun Dun might have suffered separate injuries in Maryland and the District of Columbia, which would allow the law of each jurisdiction to apply to the respective harms, this apparent discrepancy in Sun Dun's pleading raises further questions about whether the D.C.Code can in fact apply to any of plaintiff's alleged injuries.

in its Amended Complaint sufficiently state the elements of the tort to survive the pending motions to dismiss.

Moreover, as Chief Judge Harvey of this Court has noted, the third element of the test relating to malice "necessarily hinges on whether defendants' actions constitute a violation of federal or state antitrust laws." *Purity Products, Inc. v. Tropicana Products, Inc.*, 702 F.Supp. 564, 575 (D.Md. 1988), *aff'd*, 887 F.2d 1081 (4th Cir.1989). For this reason, "a summary disposition in favor of the defendants [is] appropriate only in the absence of a demonstrable antitrust violation.... [Plaintiff's] business tort action under Maryland law stands or falls along with its federal antitrust claims." *Faulkner Advertising Associates, Inc. v. Nissan Motor Corp. in U.S.A.*, 905 F.2d 769, 775 (4th Cir.1990) (quoting *Purity Products*, 702 F.Supp. at 575, with approval and remanding state claim for consideration with federal antitrust claim). Because the Court has found that some of plaintiff's antitrust claims are sufficient to withstand defendants' motions to dismiss, the claim for tortious interference likewise must remain. Defendants' motions to dismiss Count VIII are therefore *denied.*

### CONCLUSION

To summarize the Court's rulings, plaintiff Sun Dun has standing as a direct purchaser to seek damages under Section 4 of the Clayton Act for any harm suffered in that capacity as a result of defendants' alleged violations of federal antitrust law. In addition, plaintiff has standing as both a direct and indirect purchaser to seek injunctive relief under Section 16 of the Clayton Act. The D.C.Code, under which plaintiff has set forth pendent claims, affords Sun Dun standing as both a direct and indirect purchaser for damages and injunctive relief.

Defendants' motions to dismiss plaintiff's claims under Section 2 of the Sherman Act are *granted*, as are the motions to dismiss claims under Section 3 which rely on the essential facilities doctrine. In all other respects, defendants' motions to dismiss plaintiff's claims under Sections 1 and 3 of the Sherman Act are *denied.*

The Court, in its discretion, will exercise pendent jurisdiction over plaintiff's claims which rest on the D.C.Code or on Maryland tort law. Because an assessment of defendants' liability for unfair competition and tortious interference with business relations depends upon the resolution of the antitrust claims, defendants' motions to dismiss Counts VII and VIII are *denied.*

Defendants' motions to dismiss the claims brought under the District of Columbia's law are *granted* with respect to the claims arising under D.C.Code Ann. § 28–4503 (1981), for the reasons stated in dismissing plaintiff's claims based on Section 2 of the Sherman Act. In all other respects, defendants' motions to dismiss the D.C.Code claims are *denied.* The Court cautions, however, that the D.C.Code can only apply to those of plaintiff's claims which involve a sufficient nexus to the District of Columbia to warrant the application of that jurisdiction's law under the doctrine of *lex loci delecti*, and which are not so interstate in nature as to offend the Commerce Clause, were the D.C.Code to be applied to them.

An Order will be entered separately which embodies the above rulings.

### ORDER

For the reasons set forth in the foregoing Memorandum of even date, IT IS, this 25th day of June, 1990, ORDERED:

1. That the defendants' motions to dismiss claims set forth in Counts III, IV, V, and VI of plaintiff's Amended Complaint which arise under Section 2 of the Sherman Act BE, and the same hereby ARE, GRANTED;

2. That the defendants' motions to dismiss claims set forth in Count VI of plaintiff's Amended Complaint which arise under Section 3 of the Sherman Act and which rest upon the "essential facilities doctrine" BE, and the same hereby ARE, GRANTED;

3. That the defendants' motions to dismiss claims set forth in Counts III, IV, V,

and VI of plaintiff's Amended Complaint which are based on pendent jurisdiction and arise under D.C.Code Ann. § 28–4503 (1981) BE, and the same hereby ARE, GRANTED;

4. That in all other respects defendants' motions to dismiss federal and pendent claims set forth in Counts I, II, III, IV, VII and VIII of plaintiff's Amended Complaint BE, and the same hereby ARE, DENIED.